v. the Consolidated Case. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. The question in this case is whether cities can sue under one of our nation's most important laws, the Fair Housing Act. Our answer to that question is yes, sometimes, and I mean three things by that. First, the answer can't be yes, always, because that would have been the only answer.  Second, the answer can't be no, never, because cities can identify concrete harms that fall within the zone of interest, such as discrete expenditures to combat a particular defendant's racial misconduct. And third, this lawsuit fails both the zone of interest and proximate cause because the injury it seeks to remedy is unrelated to the act's purposes and because that injury is several steps removed from any alleged acts of petitioners. If I could start with zone of interest, this Court in Lexmark. Ginsburg Before you do that, Mr. Katyal, could you please tell us, you said yes, cities can sue under the FHA, but not in this scenario. Can you tell us what, under what circumstances could a city sue? Katyal Absolutely, Justice Ginsburg. So our position is to preserve existing law exactly where it is, and existing law identifies two places where cities can sue. One is a Havens-like situation in which a city, like the NGO in Havens, is combating discrete instances of discrimination by a defendant and outlaying things, so testers or something. So if you took the allegations in this complaint and made them out to be the banks were basically expend funds to test that out, to enforce its housing statutes, that looks very much like the one-to-one relationship that was at issue in Havens, both for zone of interest and for proximate cause. Sotomayor I'm sorry. In Havens, the testers were not city employees. In Havens, they were private organizational employees whose job it was to do this. So why are you attributing the testers' work to the city directly? Katyal Because, Justice Sotomayor, in that case, and this is paragraph F of the complaint, it's appendix page 20 in Havens, the complaint asks for the city's expenditures to combat, to identify specific things, including testers and other, you know, other enforcement things. Sotomayor Why is this different than the other allegations in Havens that had to do, like here, with lost revenues, with lost tax base, which the Court cited as well? Here there are direct expenditures in terms of increased monitoring of the area by police and other services. Are it those city expenditures? Katyal So those, that's not Havens, Justice Sotomayor, with respect. I think that's Gladstone. Sotomayor I apologize. Katyal But our position is that to the extent the city can plead a complaint that looks like Gladstone, and this gets back to Justice Ginsburg's question, the second bucket in which the city can assert an injury is just like Gladstone, in which there's a segregation claim that is being advanced. There was that racial steers, the realtors were literally steering African-Americans out of the village. That is an anti-discrimination harm to the village itself. And so for zone of interest purposes, Gladstone doesn't talk about proximate cause at all, but for zone of interest purposes, there's absolutely nothing wrong with that. That is, the city has identified. Sotomayor, you're thinking that if banks are forcing people out of a neighborhood, that that's not discrimination? Katyal Oh, no. I'm saying, Your Honor, I'm saying that to the extent that that is segregation interest, absolutely it is, and that's what Gladstone recognizes. Here's what it doesn't recognize, though. It doesn't recognize something like this complaint, which is not that the city is pleading an anti-discrimination interest. Rather, they are borrowing someone else's anti-discrimination interest, namely the discriminatory loans that happen. So, look, our position is the direct victims can obviously sue for that, but so, too, can the Justice Department and HUD, because that's what Congress empowered them to do, to have a version of parens patriae standing. But what they're saying is, well, we're harmed downstream by our tax revenues and things like that. That looks very much like the shareholder in Thompson that so concerned this court. That is, the shareholder there was not identifying an anti-discrimination injury. They were identifying an economic injury and cutting and pasting the anti-discrimination. Ginsburg. But in Gladstone, which is the case of a village suing, they were suing for diminished property values, which resulted in loss of revenue. That was so, to that extent, these two cases seem the same to me. The bottom line, the municipality says our tax base has been depleted. The properties have gone way down in value. So, Justice Ginsburg, I think that that's not totally correct for two reasons. Number one, in Gladstone, the injury itself to the village was an anti-discrimination injury. That's the first part of Gladstone. This is found at page 110 of the opinion. Here, they haven't identified an anti-discrimination harm to the City of Miami. They've identified an economic harm. So that's why this case is not within the zone of interest, but the one there is. It looks much – you can think of it this way. There are kind of two lodestars in this Court's cases. One is the Thompson shareholder, the shareholder who has an economic injury. No doubt they're hurt by an underlying act of discrimination at the front end against someone who is fired, like the CEO who is fired for race discrimination or something like that. But this Court said, uh-uh, that opens the door towards way too many lawsuits and layoffs. Ginsburg. That was a hypothetical the Court brought up on its own. I'm surprised you put so much weight on Thompson, because that was a case that upheld standing. Oh, absolutely. And, again, our position, I think, is fully consistent with Thompson. That is the language in the opinion itself. It certainly was something Justice Kennedy raised at oral argument and then picked up by Justice Breyer and Thompson. But the actual language of the opinion does talk about shareholders. And it's not just Thompson. This Court's unanimous decision in Lexmark says something much the same about landlords and utility companies. And if you accept their interpretation, you are opening the door not just to the city, but to anyone else who can borrow someone else's anti-discrimination interest, cut and paste it, and to the city. Kennedy, is your concession, I'll call it the concession, your formulation that the city can sue sometimes, are you thinking that the city might be in the same position as HOME was in, was it the Havens case? So there's two different buckets. In the first bucket, that was my first answer to Justice Ginsburg, yes. The city is like HOME, the NGO there. They're identifying specific concrete interests, the expenditures that they have to outlay to combat a defendant's, you know, racial misconduct. And so to the extent that a city wants to do that, that's absolutely fine. There's a second category of things as well. Kennedy, are you saying that, and I don't want to foreclose, prevent you from finishing your answer, but are you saying that the city is limited as to the damages that it can recover? On that theory, in that bucket, yes, they'd be limited to the damages there. Now, on the second bucket, the segregation plus the costs that they incur in trying to eliminate discrimination. Just as it is in the NGO in Havens. Now, Justice Kennedy, I see you're troubled by that, but I would point out the second thing is the Gladstone segregation category. And in that circumstance, the city can recover for, you know, we'll put proximate cause to the side for a second, but just in terms of zone of interest, they can recover for the harms by making an integrated neighborhood become segregated, however marginally that may be. That is something they can recover for, as well as, of course, injunctive damages. Kennedy, what would that be, added police force or something? No, I don't think it would be, you know, again, that would, I think, run into proximate cause problems down the road, because there are many steps of causality, as our brief explains. Kennedy, what could the city recover for the general damages of having a segregated or more segregated community as a result of the defendant's actions? Well, I think that anything that they can directly outlay, and that may be very hard to identify, and that's why normally this is done more on the injunctive side. And I think the scheme Congress had in mind was to give perens patriae standing to the Justice Department and to HUD to bring these cases and just to make sure that they're not going to be used as an excuse for the defendant's actions. I mean, if the city can recover for having a more segregated environment, that seemed to be measured by all sorts of things, including tourists aren't going to want to visit it as much. How would you measure the damages if the harm is simply having a more segregated city? I don't know that it runs into the same thing. I'm making an argument about what this Court's precedence on standing requires, starting with the 1990 decision in Lujan, which says the city has to identify his – the words of the opinion is his injury. So here the city has to identify an anti-discrimination interest that they have suffered. They can't cut and paste and borrow someone else's. So to the extent we're talking about, as this complaint does, kind of diminution in tax bases and so on, and that's their injury, that is not an anti-discrimination injury. And so the way to reconcile all of the other –  But, Mr. Cottrell, that suggests that when Congress passed the FHA, it was looking only at individual acts of discrimination to particular persons. But the FHA is a very peculiar and distinctive kind of administrative of anti-discrimination statute, which really is focusing on community harms. And we talked about this a lot in the Texas housing case of a couple of years ago. So it's not just individuals who are harmed. It's communities who are harmed. And that's the basic idea of the entire statute, why Congress passed it. And here the cities are standing up and saying, every time you do this redlining and this reverse redlining, essentially a community is becoming blighted. And who better than the city to recognize that interest and to assert it? Well, we certainly recognize that that is something that is at issue in one of the goals of the Fair Housing Act. But I think the way Congress dealt with that is not by saying cities are empowered to have some sort of parens patriae standing. That's what they gave the Justice Department and HUD. And as well, by the way, Justice Kagan, in 3610F, Congress empowered State and local enforcement over housing discrimination to deal with those types of community-centered problems that you're talking about. But here, they're not using any of that. They're coming in and saying we are a, quote, person aggrieved. And a person aggrieved in a statute whose chapter is entitled, quote, enforcement by private persons. And our position is that they are a person aggrieved under the – given Congress's purposes in the Act, because they're saying, as you did this redlining, as you did this reverse redlining, our communities, the thing that makes us a city, was becoming more and more blighted. And that's what we're trying to recover for. The costs of responding to that, the costs of not having revenues in order to carry out our services for that community and for others. It's not parents patriae. This is their own interest in maintaining their communities free of the kind of racial discrimination that the Act says causes neighborhood blight. Justice Kagan, if the complaint were written to say that it was about segregation causing blight, we would have no problem with it, which is what I was saying to Justice Ginsburg with respect to zone of interest. The city would fall within that zone of interest. That's Gladstone. And that's what the Kerner Commission report, which you're referring to, says, which is blight is caused not just on its own, but it was a result of segregation. The references to blight in the Kerner Commission report follow from segregation. Kennedy, how far out would damages extend in the hypothesis you just gave to Justice Kagan? So for zone of interest, I think, you know, you're able to get, you know, I don't think it matters. That is, to the extent that the city can please, excuse me, the complaint by the city pleads a segregation harm, even if it's downstream, they're within the zone of interest. Now, to turn to proximate cause, though. I'm sorry. I guess I don't understand why this isn't a segregation harm. Here, the city is saying you've done this redlining, you've done this reverse redlining. It's not that it just causes various foreclosures all over the city. It's causing foreclosures in particular concentrated areas. And it's doing that because of racial segregation. And at the same time, it's preventing that racial segregation from ever being lifted because those communities are becoming more and more blighted and less and less capable of becoming integrated communities. So everything about this complaint is about racial segregation, it seems to me. Justice Kagan, I'd encourage you to just look back at what you just said and then read it against their complaint, because none of that's in the complaint. So do you think everything I just said, if their complaint was written like that, that they could maintain this suit? They could maintain a suit for segregation, and the measure of damages wouldn't be the measure of damages which they're seeking, which is recovery for the 2008 foreclosure crisis in Miami, and to the tune of billions of dollars nationwide. It would be, again, at most, and I want to get to proximate cause, but it would be at most the delta between a segregated community that now exists as a result of the defendant's particular conduct and an integrated community that would have existed otherwise. That would be the only measure of damages. This complaint How do you measure that? I'm not sure, and that's why I do think ultimately it may fail on proximate cause, but at least we've been talking so far about zone of interest, and that's of course all Gladstone dealt with, was zone of interest. And with respect to zone of interest, I think that that complaint, the one that, Justice Kagan, you read, would satisfy zone of interest. It would allow at least a city to come in and get injunctive relief to try and preserve the kind of community-centered concepts that you're talking about. Now, the question is, would they be able to recover damages for that, including damages to the diminution of their tax base? It's certainly true, Justice Ginsburg, that Gladstone has that line at the end of page 110, which talks about diminution and tax revenues. The next line is, of course, that's enough for Article III standing. So I don't think this Court has ever decided the question of whether or not proximate cause principles allow a segregation lawsuit to extend so far. Ginsburg, I think Gladstone would be, I take it from everything you said, that Gladstone would flunk at the proximate cause stage. So I do think that that's right. That is, there would be so many steps involved, and you could just take a look at this complaint, and if you look at the Solicitor General's brief at page 30, you see all the steps that are required before the city is injured. You have to have discriminatory loans. Those discriminatory loans have to lead to defaults. The defaults have to lead to foreclosures. The foreclosures need to lead to increase in vacancies. The increase in vacancies needs to lead to reduction in property values. And then that is supposed to reduce. Kennedy, I usually think of proximate cause, correct me if I'm wrong, as a question of liability, not damages. Palsgraf, no liability. Correct. So it is a question of damages. But you say proximate cause bears on both liability and damages? I do. I think that this Court has kind of thought about it that way. You could look, for example, at Lexmark, and it said, you know, I think what this Court has said is you look to the underlying damages that are being sought to understand, is the complaint within the kind of standard proximate cause principles? And here, if you accept their theory, that chain, you'll be doing something I don't know that this Court has ever done before, which is to allow such a long chain of causation, a nondirect cause of chain of causation to the tune of, again, billions of dollars to recover for the loan. Kagan. I'm sorry. Go ahead. Kagan. Can I ask a separate question? We've been talking a lot about zone of interest and a question about whether the zone of interest test applies at all, because you have these three cases prior to this 1988 reenactment of the old 1968 language. And in each of these three cases, in Traficante, in Gladstone, in Havens, the Court very specifically says that this language stretches to the limits of Article III. So Congress is amending the statute in 1988 against that backdrop. Why shouldn't we understand that to mean that the language means it stretches to the limits of Article III? So for three reasons, Justice Kagan. The first is that at most the congressional ratification doctrine only applies to holdings of the Court, not dicta. And I know you weren't on the Court for Thompson, but all of the rest of us were here, and in Thompson, the Court unanimously says that the Court went through this. They heard the Solicitor General's argument at the time, which was that this was all to the limits and binding holdings, and what this Court said was its dicta. I guess I don't understand that. I mean, we can argue about whether these were holdings or whether these were dicta, and that's fine. There are arguments on both sides of that. But here I am. I'm Congress. I mean, suppose you were an advisor to a congressman, and the congressman said, okay, I don't really like this idea of going to the limits of Article III. I think we should limit it. You say, no worries. Just use the same language. And he says, use the same language? That language has been consistently understood to go to the limits of Article III. And you say, oh, no, don't worry. It's dicta. And he says, okay, I feel relieved. We can now use this language. I mean, wouldn't you be fired? Katyala, Your Honor, I think I'd be fired if I did what you said, which is not actually follow what this Court's cases require, which is, quote, an express negation of the zone of interest test, not borrowing from some, you know, implicit doctrine. Because at its high watermark, this Court has said in JAMA the congressional ratification doctrine is only a guide toward what Congress implicitly thought, and at least starting in 1983 in the Block case, and I think going even before that, and the AGC case, perhaps going even before that, this Court has said you need an express negation by Congress in order to abrogate the zone of interest test. And that is just not what happened here. At most, they're borrowing. Ginsburg. It is a strange development, because the zone of interest test, at least as it was announced in data processing, was understood to expand standing over what it had been before. So the zone of interest test was not hemming in standing. It was facilitating the ability to bring lawsuits. Well, certainly, but by the time of Block, which was a case about limiting standing, and that was before 1988, so I think you've got that problem, you'd also be fired, Justice Kagan, for another reason in your hypothetical, which is the congressional report that you wrote, the House report, as a staffer, says, you know, there's only two things that you were trying to codify. One was that testers have standing under Havens, and the other is that administrative and judicial standing applies the same standard. Those are the only two things in the House report. I don't read the House report that way. The House report does refer to a couple of particular aspects of those cases. But the House report seems to me to cut against you, because it makes clear that Congress knew about those cases, and those cases are, of course, the cases which said that standing stretches to the limits of Article III. And if you really look at the legislative history of this Act, it's pretty clear that when Congress is acting in 1988, it took off the shelf a bill that was discussed in 1980. And in that bill, there was a lot of discussion about whether standing should go to the limits of Article III. And Congress was thinking of changing that language, and Drew Dayes, the Assistant Attorney General for Civil Rights, and the HUD Secretary, they both come in and say, and they tell Congress, if you change that language, it's a problem, because then you're cutting back on standing. And Congress decided not to change that language, because it wanted, as Drew Dayes said and as the HUD Secretary said, to go to the limits of Article III. Katyal, even if all of that is true, I think this Court has insisted on an express negation for precisely this reason, so that you don't go to Drew Dayes and what happened in 1980 and stuff like that. Sotomayor, I think it's important to stress and express limitation that means we're not, we're doing away or we're keeping the zone of interest, because Lexmark itself, which establishes that rule, there was no explicit statement. What the Court did was look at the statute, the Endangered Species Statute, look at its words and decide that any person meant any person, and decided it did away with the definition of a grieve. And the Court in 1988, taking the word aggrieved, which was in the Title VII and many other statutes, but undefined, and what it did was take the definition looked at by prior regulations, examined by this Court in its three cases establishing Article III standing, and put in a definition of aggrieved that is very different from the normal definition. Why is that? Katyal, it is not very different. It is a plain-Jane definition of person aggrieved. It doesn't look like what you're talking about, the Endangered Species Act, which allows any person to sue. And if their interpretation is, if it's accepted, you'd be doing something I think for the first time in the Federal Code. There is no all-comers, damages statute that allows anyone to sue the way their interpretation would. Now, in proximate cause, our main point to you is this. This Court in Lexmark said there's a general rule, and this is an independent argument from zone of interest, there's a general rule that says that liability is cut off after the first step. If you adopt this theory of the complaint, you're accepting sixth-step liability in a way that this Court has never done before. At most, this Court in Lexmark unanimously said, you can expand it a little bit beyond the first step for a kind of one-to-one relationship. But here, this Court, this complaint is seeking damages for the foreclosure crisis of 2008, something that is way, way beyond anything this Court has insisted on. Kagan. When you say that, when you said to me that the complaint that I wrote would have been covered by the Act, do you think it also would fall within proximate cause principles? I think that the complaint would have to satisfy a directness requirement. So to the extent that the city could identify segregation harms directly in the way that maybe a university could when they become, you know, when they lose diversity or something like that, to the extent there's some kind of direct close to one-to-one relationship, absolutely, 100 percent every day of the week, and of course, Congress could write a statute that enables something and abrogate the traditional proximate cause doctrine. But here, they haven't done any of that. Here, they have applied, again, a kind of plain-Jane version of damages, and what they're seeking here with this creative complaint, which, you know, the Fair Housing Act has been around since before I was born, and only until a couple years ago have we ever seen a complaint that looks anything like this. Here, they're seeking to recover for the foreclosure crisis of 2008. That can't possibly satisfy proximate cause principles, starting with Justice Holmes' opinion in Southern Pacific in 1918, going all the way to the Holmes opinion of this Court just more recently. So you've got kind of Holmes and Holmes.   Kagan. Kagan. Kagan. Kagan. Kagan. I guess when I started reading the briefs I was confused about this because there's one understanding of proximate cause, which is that usually approximate cause is about foreseeability and only foreseeability. Now, there are definitely places where we've said there's a seditional directness requirement. But only in pretty discrete areas. I mean, I guess I sort of come back to this notion that I think what our precedent suggests is it's a little bit statute by statute as to whether proximate cause is a foreseeability inquiry and only that, or whether it has additional components. I'll answer that, and then if I could reserve the balance of my time. I think this Court in Paroline said, quote, I think Paroline and Lexmark both do that. That is the general rule, not the outlier rule. Sotomayor, so what do we do with all of the statements in Havens? I'm quoting. There is little significance in the difference between direct and indirect injuries for purposes of filing suit under the FHA. Treficante, while members of minority groups were damaged the most from discrimination, the proponents of the legislation emphasize that those who were not the direct objects of discrimination had an interest in ensuring fair housing. Justices Sotomayor, I absolutely agree with all of them. Those are standing cases. We have repeatedly said that the difference between direct and indirect, it has no meaning in this statute, but foreseeability always has meaning. Justice Sotomayor, you've never said anything about proximate cause. That all goes to standing. That's a completely different inquiry, if I may reserve. Roberts. Thank you, counsel. Mr. Peck. Mr. Chief Justice, and may it please the Court. The City of Miami brought these cases seeking injunctive relief and monetary damages because the bank's practice of providing minority borrowers with more expensive and riskier loans than they qualified for or that non-minority borrowers received actually frustrated and counteracted the city's efforts on fair housing and intended to cause the city to lose the benefits of social, professional and business opportunities that come with an integrated community free from housing discrimination. Now, you heard my friend describe these as two buckets, that if the complaint makes that out clearly, then we do have standing that we fit within the zone of interest. We thought that the original complaint that we filed made this apparent. The Eleventh Circuit agreed with us. But when the district court dismissed us with prejudice on the original complaint, we made a motion for reconsideration to try to make more explicit what we thought was implicit in this complaint. As a result, the Court did deny us the opportunity to do that. But if you look at that amended complaint, it does talk about the fact that the city operates a department of community and economic development which takes complaints about fair housing, that tries to mediate it, that counsels, that educates citizens about it, and is in charge of all these kinds of efforts that we thought were part of our original complaint. At the same time, we recognize that the injury to the city is one that comes from the failure to follow the nondiscrimination principles embodied in the Fair Housing Act. And so those two buckets do exist in this complaint, and if they don't, then they do exist if we had the opportunity to amend the complaint and make it even more explicit. And the other thing is that I'm looking at the joint appendix, page 186, your opening paragraph, where you say BOA's conduct has harmed the residents of Miami and impaired the city's strong, longstanding, and active commitment to open integrated residential housing patterns and its attendant benefits of creating a stable community. And then you go on to the specific damages, the loss of tax revenues and increased expenses. It's those types of allegations in your amended complaint that you're pointing to? I point to those. I point to those on 232 and 233, which describe the operation of our Department of Community and Economic Development. And so as a result, this pretty much tracks Havens and Gladstone. It does, indeed, Justice Sotomayor. And so as a result, we think that regardless of whether you take the Article III approach to standing in this case, or take a more narrow formulation that depends on the fact that our agreement is tied to violations of the Act, the city of Miami has standing. And the – I don't understand either bank in their briefs to disagree with us on that, as long as we make those pleadings. And so it seems odd that we would be prevented from making those pleadings as explicit as possible, certainly under Rule 15. Kennedy, do you think you are a direct victim of discrimination? Because it seems to me that the damages that you seek are not going to be paid to those who were the direct victims of the discrimination. We are seeking – we are a direct victim. This Court has repeatedly, in all three cases dealing with standing under the Fair Housing Act, recognized that it's direct and indirect damages that are at issue, that plaintiffs who are indirectly harmed are also harmed. And our – we're suing for our own injuries. We do not have parents' patriae status to sue for our residents. Roberts Well, but your injuries are derivative of the injury to the homeowners who had the subprime mortgages and who suffered foreclosure and so on. You don't start with you. I understand your argument that you're down the line, but I don't see how you can say that your loss of property taxes is a direct injury. It is a direct – what we're saying is the injury here is the injury to our interest in an integrated community that has those business and social opportunities that this Court found cognizable in Gladstone. Where is the limit to that? I mean, you ask for property taxes, but presumably you suffer loss of sales taxes because of the blight on the community. It's less attractive to tourists, so you lose tourist revenues. Why would we – would you be able to recover loss in tourist revenues? We do not think we can. Well, why is that? Because you certainly can see the logic. It's not as attractive a city. People are going to go somewhere else and so on. But cities are in a unique position. This is their neighborhoods. These are their residents. There are zoning laws. The issues of property values and even property taxes are baked into the home loans that are made by the banks. They are part and parcel of the issue here. And the fact is that the cities have an affirmative obligation that require them to look out for fair housing. Miami, among other cities, gets block grants from the Department of Housing and Urban Development that require them to take affirmative loans. Roberts. Roberts. You don't get taxes that you would get from tourists coming and visiting. You do get property taxes. So what is it that cuts off the chain? Well, we believe that because it has to be tied specifically to the property. So we could get property taxes. But how do we – how do – how are in cost of increased services, whether it's police or whatever, how is that directly tied? We are not claiming for the increased services of police, but our department that has to look for unsafe structures and find those structures because they've been abandoned after foreclosure, that our department that has to remediate neighborhoods. So this is the other end of having fought against afflictions to fair housing. This is the other end when you try to remediate the neighborhoods and make it whole again. So those efforts are the ones that we seek damages for. And those flow directly from it. Let's note that in Gladstone, this Court recognized that a city, a municipality is directly injured in its property values and the taxes that are foregone that go to services. And so that's where we see the direct connection. Ginsburg. Mr. Katyal said that Gladstone never got to proximate cause. It just decided whether there was a standard. Justice Ginsburg, the Court did not describe proximate cause here, but it's hard to read that sentence as anything but referring to proximate cause. It is a direct injury that flows from the discriminatory conduct. Now, one thing that my friend also said was that we're seeking billions. Now, in our complaint, we mentioned the fact that we have lost millions, not hundreds of millions, not billions in property taxes. We note that before the City of Miami brought its case, the cities of Memphis and Baltimore both brought cases. And they ended up settling cases with identical types of allegations for less than 10 million each. So we're not talking about huge sums of money that they would have to pay. Roberts. Presumably one of the issues factored into the settlement was the question that's presented today. In other words, if you would have prevailed, they wouldn't have to give up a percentage on the possibility that they might not be stating a claim. You know, it's possible. At that point, I don't believe anyone had raised proximate cause as a separate issue, but the cities had survived multiple motions to dismiss that went to the zone of interest. So that is what caused other cities to see the survival of that and the settlement of those cases as a possibility to bring these cases. Sotomayor. Mr. Peck, would you go back to the question the Chief started with, which is how do you define the limits of your foreseeability test? Clearly, less tourism, less sales tax, less of a lot of other things can be potentially foreseeable, but you're suggesting they're not recoverable. So is it because they're not foreseeable, or is it because they're not measurable? I think they're difficult to measure. And they may be foreseeable, but I think that also there's the potential for superseding events that cut off the causal chain there. But here, when you use the word, the phrase, the concept of proximate cause in determining how far damages extend? You know, I think it provides some help, but not a great deal of help. In Lexmark, for example, So where do I turn next? Well, you know, in Lexmark, the guidance that this Court gave was that damages incurred for the very conduct the statute prohibits. We think that what we've done is propose a approach The statute doesn't prohibit decreasing property tax values. But it does prohibit anti- it prohibits discrimination in housing. And this is one of the damages that we suffer that is directly the result of these kinds of home loans. So therefore, we've tried to cabin our damages with respect to the specific properties and the damages they generate directly to the city. You know, all proximate cause requires is a sufficient connection between the alleged misconduct and the result, and it includes any injury the statute seeks to protect against. So here we have injuries that the statute seeks to protect against. My friend doesn't disagree that those injuries are protected by the statute. And certainly, in Gladstone and Havens, those injuries are the injuries that this Court recognized. So the question then becomes what's appropriate damages. We think we have proposed damages that are tightly connected to the actual injury that the city has suffered. Breyer, We have to go into that or not. I'm not saying we should or shouldn't, but I mean, do we have to, to decide this case, decide the damages, what damages are appropriate? You do not need to decide that. In fact, one of the things that the Eleventh Circuit noted is that in the time between when the briefs were written and when we argued the case, this Court came down with the decision in inclusive communities. And in that decision, the Court mentioned that there is a proximate cause pleading standard that needs to be incorporated. And the Eleventh Circuit said, we're not going to delve into what that exactly is and remand it to the district court for that decision. And we think that that can play out in the further litigation of this lawsuit. So if we include language along the lines that don't worry, it's not going to be very much based on the experience in Baltimore and Memphis? Well, I just think that the fact that our opponents have indicated that we're talking about billions and billions of dollars and that this is about the 2008 financial crisis, which I also want to deny, needed a response. And with respect to the financial crisis, if the 2008 financial crisis was indeed the purpose of this lawsuit, then the statute of limitations, which is two years, would have ended this lawsuit a long time ago. But instead, what we found and what the Eleventh Circuit acknowledged is that while the kinds of loans, the financial crisis was set off by subprime lending, but the kinds of loans that are being offered here have taken different forms, but the underlying practice remains the same, that minority borrowers are getting more expensive and riskier loans that are quicker to foreclosure, and that foreclosure may be as many, for some minorities, seven times as frequently as non-minority borrowers. Roberts, is there a difference? I couldn't the complaint was not clear to me anyway, between subprime loans and predatory loans? Predatory loans are used as sort of a generic term to talk about taking advantage of a borrower. Subprime loans are simply those loans that have interest rates that are so low that it looks like it's a wonderful deal until, of course, you look at some of the balloon payments that are later. Roberts, are all subprime loans properly categorized as predatory? I believe that the subprime loans that fuel the financial crisis are all considered predatory. Suppose you have a business that is losing money, losing employees because the neighborhood is deteriorating. Do they have a stronger or a weaker claim than you do? They've lost profits from their business because the neighborhood has been debilitated. I think they have a weaker claim. We have a claim that's tied to the fact that they're property owners. They are property owners, but they are also commercial property owners. And there's no damage to their personal property. But here, what we're saying is, if I can step back for a moment, the Endangered Species Act, this Court in Bennett v. Spears, recognized that Article III standing applies to the Endangered Species Act. But you still have to make a claim that's based on an interest in the preservation of animals. You can't make a claim based on discrimination as that applies to housing discrimination or something like that. There is some generalized zone of interest that ties the statute to the cause of action. Here, I say that the city has a special interest in fair housing and an integrated community that the FHA is designed to vindicate. The employer does not. The local dry cleaner does not. Now, they have this unique relationship to the fact that this is their community, their neighborhoods, their residents, which they zone and they decide how the property is supposed to be used, and they provide services to every one of these residents. And so therefore the business owner have an interest in running his business in an integrated, vibrant neighborhood, just as the city would have, I would say, a less direct interest in having that neighborhood preserved in the city. You know, it may be so that a particular business does have that interest, but I think that it's very difficult to claim the kinds of damages that you've claimed. Remember, one difference between the FHA and Title VII, for example, is that we recognize indirect harms. We allow neighbors, testers, nonprofit organizations, and cities, and developers, and real estate brokers all to sue to vindicate that interest. We don't allow the equivalent of a neighbor, a coworker, to bring an action for discrimination that's been visited upon one of their colleagues. We don't allow others within that kind of realm to bring these actions. And I think that's part of the problem that a business that makes this claim might have. So in the end, what I'm suggesting is that there are direct injuries by virtue of these two, what my friend describes as buckets, a direct injury to the city in its efforts to secure fair housing by draining those resources, and those resources are recoverable, and that that indeed satisfies any kind of proximate cause, as well as an injury to that interest in an integrated community that allows the business opportunities, the social opportunities, the professional opportunities to flow that this Court recognized in the Gladstone case and suggested that the appropriate and even my friend in his brief suggested the appropriate damages in such an instance is the loss of property values and property taxes, which frankly are part and parcel of this whole mortgage loan industry. So we're not asking for something that's different, that's out of the realm, that's away from what this process is, but something that's integral to that process. So in the end, what we suggest is the City of Miami is not so marginally involved in fair housing, is not working inconsistently, and its injuries are so far from it that we are outside the zone of interest, whatever zone of interest applies, because, after all, it's not a very demanding test, and there's a reason for that, and that's because we are aggrieved in every sense of the word by the discrimination that was propounded here. And at the same time, we think that that statement from Lexmark that I quoted earlier, that it has to essentially flow from the fact that there was some violation of the Act, is sufficient, too. In each instance, we think our injury is direct, but even if it were to be examined more minutely, as my friend suggests, those minute steps are all true of the individual borrower who has to take out a discriminatory loan, who has to then default, who has to then arrive in foreclosure, who then has to find that he has to abandon that house, and then he can bring his lawsuit still, because all the things that he has to do, all those different steps are, you know, the financial state of the economy, the nature of his job situation, his family situation, all have effects on that, but we recognize that this is proximately caused, his damages are proximately caused from the injury that the Fair Housing Act recognizes. So for those reasons, I suggest that this Court ought to affirm the 11th Circuit. Thank you, counsel. Mr. Gannon. Mr. Chief Justice, and may it please the Court. In Gladstone, this Court concluded that a municipality was injured if discriminatory housing practices caused a reduction in property values and therefore diminished its tax revenues. Congress recodified that result with its 1988 amendments to the Fair Housing Act, and the Court should hold that the same injury is still cognizable today, whether under an Article III rationale or a broad zone of interest rationale. If I could turn to some of the points that have already come up today, my friend on the other side says that you can't cut and paste injury from one plaintiff to one victim of discrimination to another. That's an argument that Gladstone specifically rejected. In footnote 9, the Court said that what matters here, and this is what was the breadth of the Trilogy of Fair Housing Act cases that the Court decided between 1972 and 1982, is that somebody has had their legal rights violated by discriminatory housing practices. It doesn't necessarily have to be the plaintiff's legal rights. The plaintiff has to be injured by that violation, but it doesn't have to be their rights that are violated. And that's what we think is the work that's being done by the atypical definition of a grieved person that Congress put back into the statute. Kagan. Well, that's a very broad statement, Mr. Gannon. What do you do, then, with the restaurant or the dry cleaner or the laundry or whatever that wants to sue for somebody else's discrimination? Well, I agree with my friends on both sides that that limit is going to come from the proximate cause analysis. We don't disagree that there is still a proximate cause limitation implicit in the statute. And here we think that although Gladstone didn't address proximate cause in those terms, it is important and significant that the Court there said that the city is directly injured by the decrease in property values. And we think that the test, the ultimate test that this Court stated in Lexmark of course the Court has repeatedly recognized that proximate cause is a statute by statute situational inquiry that depends upon the nature of the individual statutes, but the ultimate test is whether there is a sufficiently close connection to the conduct that the statute prohibits. And what this statute prohibits is discriminatory housing practices. You may not need to go into it, but how does proximate cause help? You could have a dry cleaner or you could have a magazine that writes about successes in integration and wants to write about this community before it got wrecked or whatever. The clause could be absolutely clear, absolutely clear. Fifteen bishops testify. It was totally causal related. I mean, do they all have suits? Well, I think that what we are saying is that they can get themselves into the home framework from Havens, then maybe they can say that they have specific costs that are associated with fighting discrimination. But I wanted to say that what we have to say. Breyer. No, no, you heard what the question was, the question before, and it still is if we get into it we may not need to. But if we did, it would be somebody in Alaska who writes magazine articles about successes in integration is going to be wrecked because they don't have the integration in his prime example. Absolutely clear the causal connection. Can he bring this lawsuit? I mean, I'm surprised. No, we think that that is further afield, and we think that proximate cause is always about determining that something that is caused is still too far away, either in terms of foreseeability or distance or intervening cause or something else. And so proximate cause, by definition, is carving out something that otherwise would be caused. Otherwise, it wouldn't be doing anything different from traceability analysis under Article III. And here we think that the reason why this is sufficiently closely connected to the conduct that the statute prohibits is that this statute prohibits discriminatory housing practices. And those practices include things like the terms and conditions of the sale and rental of property, things about the real estate-related transactions, things like blockbusting, which was specifically prohibited by 3604e. Blockbusting was a practice in which somebody would go into a neighborhood and induce artificially low-priced panic selling by saying there are minorities coming into this neighborhood. That conduct had an effect on property prices. Sotomayor, how do we write it? Let's take the corner grocer who had a running account with Bat Home or the gardener who every week cleaned the property. I doubt someone who is in foreclosure can afford a gardener, but let's assume that possibility. Why do we write that the city has standing and its injuries are proximately cause, but those people don't? Company shareholder, what's the – how do we say it? Gannon, The link that we see is to property values, and that's the injury that the Court already recognized in Gladstone. This is a question of congressional intent. When you're construing proximate cause, you're trying to figure out what Congress intended. This Court had already recognized that a city was directly injured by decreased property values. The same thing it said was true of the neighbors in Gladstone. The neighbors who had the property values diminished were able to recover. I would say that the corner store, to the extent that it has its property values diminished, is situated just like one of those neighbors. To the extent that it's talking about something else like lost profits or the utility company is complaining they lost a customer, those things we think are further afield and not so closely connected, and proximate cause is traditionally done that type of – Roberts Could you give us some more concrete answers? The utility company, you say it's further afield. Is it covered or not? Gannon, We think it's not covered. We think that what this Court recognized in Gladstone is something that Congress was taking account of, and the property value, the effect on property values is closely tied to discriminatory housing practices. Congress was entitled to think that that relationship would endure, and as in Lexmark, there's a one-to-one relationship. Roberts How about real estate brokers whose commission is based on the value of the property? Gannon, Yes. Real estate brokers who are involved in the transaction, we discuss in our brief that those are the type of people who have an interest in the transaction, even if it's just an economic interest, they're able to recover. I don't understand my friends on the other side to be disputing that, that if they have a transaction that fails to go through because of this, because of racial discrimination, then they can sue. And we think it is important for the Court to remember that you don't just have to  Kennedy Well, I mean, real estate brokers generally, they said, this is now a poor community, our commissions are going to be lower across the board. Gannon, I think that Kennedy They're somehow different than the corner grocery store? I don't get it. Gannon, No. I think if they were just generically saying business is down Kennedy That was my hypothetical. Gannon, that might be harder for them to establish. The types of cases that we've previously seen are where developers, brokers, real estate agents have talked about specific transactions that they can say were caused by discriminatory housing practices. And we do think it is important for the Court to recall that those cases involve plaintiffs who don't necessarily have a quote, unquote, desegregation interest, as my friend on the other side puts it. It is enough that they are injured in their economic interests, and as the Court pointed out in inclusive communities, a real estate developer is often a good plaintiff to challenge a local discriminatory housing practice. We don't require that they add on, that there is something like the nonprofit in Havens where in addition to wanting to make money off of developing their property, they also have an interest in desegregation. And similarly, perhaps Sotomayor Your answer, I think, to the question, Mike, is that it's limited to those cognizable suits contemplated by the statute, and you see contemplated by the statute as having to do with the possession or value of the property? We think that the harms that flow directly from changes in property value were ones that Congress contemplated both in 1968 and certainly in 1988, after this Court had already enumerated that as a particular type of harm that was at issue here. And we don't think that the city should have to establish that there's been a change in racial composition of the neighborhood in order to bring a suit, because the Fair Housing Act is intended to cover, is intended to prohibit discriminatory housing practices throughout the United States, and that includes segregated communities that aren't changing, if there's discrimination. The city can sue based on isolated instances of discrimination? To the extent that the I thought the basic pitch of the of your position is that it affects the community as a whole, and the city has an interest in ensuring the stability of the communities, not that the city could enforce particular instances of housing discrimination. I think it's both. I think that they do have the community-representing interest, but I also think that to the extent that they can say we suffer a harm from this particular transaction, let's assume it's just one particular apartment complex or something. Roberts One particular home. I suspect that that's one where there wouldn't be that much in it to have the city bring that suit instead of the individual loan owner, but I don't know if there's that much in it. Can the city bring that action or not? Yes, to the extent that they can say that there's a one-to-one relationship, they are just like the microchip manufacturer in Lexmark. Whenever there's a decline in property value on the part of the primary victim or the homeowner here, they suffer a corresponding decline in their tax revenue. Roberts So the city can bring an action of the sort we're talking about here in the case of one subprime mortgage that results in a foreclosure? If they can say that that was caused by discriminatory housing practices and that it injured them, yes. That's just like the residents in Traficante or the city in Gladstone. They're able to say we are injured by this. Roberts Thank you, counsel. Mr. Katyal, you have four minutes. Katyal Four points, Your Honor. First, with respect to this complaint, paragraph 186 and so on, we agree, or Blue Briefer page 33 says that they do identify an interest, but they have to plausibly allege some impact on segregation in order to survive. They haven't done that. They haven't told you whether segregation is increasing or decreasing as a result of the bank's conduct. Second, the damages here they seek are way, way broader than what they've painted out to be. Just the taxes in the complaint are bad enough. Indeed, the Bank of America petition, cert petition at page 34, cites one of the complaints filed by the same counsel against Cobb County seeking, quote, hundreds of millions of dollars. There are 19,300 cities in America. If you adopt their theory, you'd be allowing all of them to bring complaints just like this. Now, we've said that if you accept their interpretation, you'd be opening the door. The Solicitor General says, uh-uh, proximate cause is somehow a limitation on that. Their own proximate cause test, as our brief explains, eliminates the directness requirement. So I think it will be hard, and that's why I don't think he had an answer, Justice Breyer, on the magazine or things like that. And when Justice Sotomayor, you asked him how to write the opinion to avoid the Gardner, his answer was look at Gladstone, because Gladstone has a direct reduction in property values. That cannot be a consistent theory for this Court on proximate cause principles for many reasons, one of which is Gladstone is not a proximate cause case at all. It's not briefed or argued. But second, even that language he's reading to you is only at the very end of Gladstone saying that if you have a reduction in property values, then it will directly reduce the tax base. This complaint is totally different. You've got five steps, as the Solicitor General's own brief explains, before you even get to the reduction in property values. Each of those are opportunities for intervening causes, and all the kinds of things that this Court in Lexmark said are the reasons why we cut off liability at the first step. Now, his other answer was to say, well, look at the congressional report. The congressional report identifies that Congress was concerned with property values and therefore concerned with cities. That congressional report also says Congress was equally concerned with employers who suffered from segregated neighborhoods, employees who were fired because the neighborhoods suffered from blight, and shops and other things. So if you take their standard, which is look at the congressional report, figure out who's harmed by housing discrimination, even downstream, you would come to the same conclusion we do, which is this is an unlimited theory of liability. It would allow landlords to sue, utilities companies to sue, and Justice Sotomayor, gardeners to sue. We've also said one other thing, and, Justice Kagan, this gets to your point earlier about the congressional scheme. If you adopt on zone of interest their interpretation of agreed persons, 3612 allows agreed persons to intervene as a matter of right in Federal litigation. Our view is what Congress did was it empowered direct victims to sue, as well as some indirect victims, and the Justice Department. Their interpretation says any city, including one that's not even motivated by the same type of, you know, presumably wonderful motivations as the City of Miami, can come in and intervene in a direct victims lawsuit and possibly muck it up in any number of directions. That can't possibly be what Congress thought about when they used the words person aggrieved in the statute, to allow cities to come in and interfere with kind of lawsuits filed by direct victims. Sotomayor, our position on this, and this is very important, we're not quibbling with that.  We're not seeking to change it. They're the ones who are seeking to expand it in two directions, both by taking it out of segregation and by expanding proximate cause to the sky. Roberts. Thank you, counsel. The case is submitted.